## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MICHAEL L.[1],** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 3:23-cv-00064-GCS** |
| ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") and Supplemental Income ("SSI") pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI under Titles II and XVI of the Social Security Act, alleging disability since July 29, 2020. (Doc. 11, Exh. 3, p. 3). Subsequently, Plaintiff amended the alleged onset date to November 14, 2020. (Doc. 11, Exh. 2, p. 34). The Agency initially denied Plaintiff's application on June 8, 2021, and upon reconsideration on September 9, 2021. (Doc. 11, Exh. 3, p. 27-28); (Doc. 11, Exh. 3, p. 29-30). Plaintiff then requested a hearing on September 22, 2021, which was held on May 17, 2022. (Doc. 11,

---

[1]  Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto. The Court previously issued an Order on September 9, 2024, that inadvertently included Plaintiff's last name. This Order corrects the Court's error.

Exh. 4, p. 22-23); (Doc. 11, Exh. 2, p. 29-58). An unfavorable decision was issued by the Administrative Law Judge ("ALJ") on May 25, 2022. (Doc. 11, Exh. 2, p. 13-28). In November 2022, the Appeals Council denied Plaintiff's request for review. (Doc. 11, Exh. 2, p. 2-5). This resulted in the ALJ's decision becoming the final decision of the Commissioner, thus making it final and appealable. Id. Plaintiff then filed the present action pursuant to 42 U.S.C. § 405(g) on January 11, 2023. (Doc. 1).

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

I.   The ALJ impermissibly played doctor.

II.   The ALJ failed to consider Plaintiff's reasons for lack of treatment.

III.   The ALJ misstated Plaintiff's activities of daily living while ignoring his qualifying descriptions.

IV.   The ALJ's ultimate residual functional capacity ("RFC") was tainted by a patently erroneous consultative examination report.

(Doc. 17, p. 2).

## APPLICABLE LEGAL STANDARDS

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform his or her former occupation? and (5) Is the plaintiff unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four. Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

The scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analysis detailed above. She determined that Plaintiff had not worked at a level of substantial gainful activity since the alleged onset date of July 29, 2020. (Doc. 11, Exh. 2, p. 19). The ALJ found that Plaintiff had the following severe impairments: degenerative joint disease of the right ankle and right shoulder, mild osteoarthrosis of the left knee, degenerative disc disease of the cervical spine, and obesity. (Doc. 11, Exh. 2, p. 19). Plaintiff's chronic obstructive pulmonary disease ("COPD") and right ankle fusion were found to be non-severe impairments. Id.

In determining Plaintiff's residual functional capacity ("RFC"), the ALJ found that Plaintiff can "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except as follows. [He] can never climb ladders, ropes, and scaffolds. He can occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, and he can frequently balance on uneven surfaces. [Plaintiff] can occasionally reach overhead with the dominant right upper extremity." (Doc. 11, Exh. 2, p. 19). As such, the ALJ denied Plaintiff at step five and determined that he would be able to perform the requirements of representative occupations such as marker (DOT 209.587-034, SVP 2, light exertion level, approximately

38,000 jobs nationally), photocopy machine operator (DOT 207,685-014, SVP 2, light exertion level, approximately 15,000 jobs nationally), and small products assembler (DOT 706.684-022, SVP2, light exertion level, approximately 17,000 jobs nationally). (Doc. 11, Exh. 2, p. 24).

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

### A.    *Evidentiary Hearing*

Plaintiff was represented by Counsel at the evidentiary hearing held on May 17, 2022. (Doc. 11, Exh. 2, p. 29-58). Plaintiff stopped working in July 2020 after he injured his neck and shoulder during a fall. *Id.* at p. 35. Plaintiff filed a worker's compensation claim and received a settlement payment. *Id.*

After sustaining the injury, Plaintiff did not return to work because "[his neck] never really got any better." (Doc. 11, Exh. 2, p. 36). Plaintiff testified that he only had chiropractic treatment for his neck since it occurred. *Id.* Plaintiff ended chiropractic treatment when his chiropractor informed him there was nothing more that could be done, and the treatment no longer made sense financially. *Id.* Plaintiff has not sought out further treatment because he did not have insurance and could not afford to pay out of pocket. *Id.*

Plaintiff reported that his neck injury still causes him pain – especially when he

looks up. (Doc. 11, Exh. 2, p. 37). He also noted that there is grinding when he moves his neck from side to side. *Id.* Plaintiff claimed that his neck pain has limited his daily activities. For example, Plaintiff experiences pain when lifting a two-gallon bucket of water. *Id.*

Plaintiff also testified that his shoulder injury continues to cause him pain. (Doc. 11, Exh. 2, p. 38). Plaintiff has limited mobility in his right arm as he is unable to fully rotate his shoulder. *Id.*

Lastly, Plaintiff reported his right ankle is "always bruised [and] sore." (Doc. 11, Exh. 2, p. 38). If he puts a lot of pressure on his right ankle, pain shoots up his leg. *Id.* Plaintiff compensates for the pain in his right ankle with his left leg. *Id.* Sometimes when Plaintiff gets up his knee is swollen, and he must wear a knee brace. *Id.* Surgery was first performed on Plaintiff's right ankle in 2001. *Id.* at p. 39. Fusion surgery was reportedly performed on the ankle in 2004 or 2005. *Id.*

An x-ray of Plaintiff's foot was performed when Social Security scheduled Plaintiff to see a doctor on May 12, 2021. (Doc. 11, Exh. 2, p. 39). Plaintiff's attorney noted the x-ray showed "a complete fusion" and "severe degenerative joint disease of the sub collar joint." *Id.* Plaintiff compensates for his right ankle by relying on his left. *Id.* at p. 40. Plaintiff estimates that he uses his left side 75 percent more than the right side. Id. This causes Plaintiff's shoes to wear unevenly. *Id.* As a result of the discomfort, Plaintiff can only stand for twenty to thirty minutes at a time, and he believes he could not stand for more than a total of two hours in an eight-hour period. *Id.* at p. 41.

Plaintiff lives with his girlfriend. (Doc. 11, Exh. 2, p. 42). He reported he feeds his

son's horses two cups of grain each morning. *Id.* at p. 42. He does not drive regularly because he must "drive with [his] left foot." *Id.* at p. 43. Otherwise, Plaintiff noted that his typical day is "a lot of heating pads and sitting around." *Id.* at p. 44. He places heating pads on his hip and back and "a lot of ice on [his] ankles and . . . knees." *Id.*

The ALJ then conducted an examination of Plaintiff. (Doc. 11, Exh. 2, p. 44-50). The ALJ first reviewed Plaintiff's employment history. Plaintiff worked for MM Home Improvement builders for a year and a half framing houses. *Id.* at p. 44. Plaintiff then worked for Brets Entertainment in 2013, where he assisted with setting up facilities for events. *Id.* at p. 44-45. The heaviest objects he lifted during that job, with assistance from a dolly, weighed approximately 100 pounds. *Id.* at p. 45. The heaviest amount that he carried by hand was twenty-five pounds. *Id.* Plaintiff then worked for CTR Concrete and Builders, where he poured concrete. *Id.* at p. 46.

The ALJ then inquired about Plaintiff's home. (Doc. 11, Exh. 2, p. 48). Plaintiff indicated there were only "a couple" steps to get into his house. *Id.* The ALJ also requested more information about the treatment for Plaintiff's neck and ankle. *Id.* at p. 49-50. Plaintiff stated he wears a compression sock on his right ankle to help with the pain, and there is swelling in the ankle "no matter what [he does]" but that it worsens if he is "carrying something." *Id.* at p. 51. Plaintiff also elevates his right leg three to four hours a day. *Id.* at p. 51.

The ALJ then conducted an examination of the vocational expert ("VE"). (Doc. 11, Exh. 2, p. 53-58). The ALJ posed two hypothetical sets of physical limitations to the VE. The first hypothetical limited Plaintiff to the following:

> . . . lift and carry twenty pounds occasionally, 10 pounds frequently, stand
> and walk about six hours of eight, sit about six hours of eight, never climb
> ladders, ropes and scaffolds, occasionally climb ramps and stairs, kneel,
> stoop, crouch, crawl and [frequently] balance . . . Could occasionally reach
> overhead with the right upper extremity.

(Doc. 11, Exh. 2, p. 54). The VE indicated that with those limitations Plaintiff could perform light, SVP 2 jobs including photocopy machine operator, and small products assembler. Id. The second hypothetical limited Plaintiff to the same limitations, but only "occasionally reach[ing] in all directions with the right upper extremity." *Id.* The VE testified that Plaintiff would be able to work as a furniture rental clerk, usher, or tanning salon attendant. *Id.* at p. 55.

Plaintiff's attorney then queried the VE, asking if the expert's answers would change if Plaintiff could only stand and walk for three hours and sit for five hours. (Doc. 11, Exh. 2, p. 56). The VE indicated that this would move Plaintiff to an "unskilled sedentary job base." *Id.* Plaintiff's attorney also asked if the hypothetical individual would be further limited in terms of employment if they "had to elevate one of the lower extremities above their heart level for . . . two hours in an eight-hour period." *Id.* at p. 57. The VE replied that the position would "push [the] upper body to . . . a reclined position and employers would not allow it at work, therefore work [would be] preclusive." *Id.*

B.    *Relevant Medical Records*

Dr. Adrian D. Feinerman, MD ("Feinerman") conducted a consultative exam of Plaintiff on May 21, 2021.[2] (Doc. 11, Exh. 7, p. 127). Feinerman noted Plaintiff was

---

[2]    Plaintiff also supplied the Court with an exhibit of records obtained from a Freedom of Information Act ("FOIA") Request. (Doc. 17, Exh. 1). The records supplied to the Court included

"diagnosed with a right ankle fracture. He had surgery on the right ankle 2 times in 2001, and again in 2002. He had a fusion of the right ankle in 2005. He complains of hip, low back, and left knee pain for the past 10 years with unknown cause." *Id.* at p. 128. During the exam, Plaintiff reported he was able to walk 200 yards, stand for thirty minutes, and sit for forty-five minutes. *Id.* Plaintiff also indicated he was able to bend and squat, and he experienced no issues with fine manipulation or gross manipulation. *Id.* Plaintiff reported other musculoskeletal symptoms to Feinerman, which included "joint pain, joint surgery, neck pain, back pain, and fractures." *Id.* at p. 130.

Dr. Feinerman noted the following musculoskeletal findings after he physically examined Plaintiff:

> A)      Extremities: There is no anatomic abnormality of any extremity and no evidence of redness, warmth, thickening, or effusion of any joint. The Right ankle is fused (See range of motion chart). Grip strength is strong and equal bilaterally. (See chart) There is no cyanosis or clubbing.

> B)      Spine: There is no anatomic deformity of the cervical, thoracic or lumbar spine and no limitation of motion of any spinal segment. (See range of motion chart).

> Ambulation is normal without an assistive device. The claimant is able to ambulate 50 feet.

(Doc. 11, Exh. 7, p. 131). Feinerman also found that Plaintiff had no difficulty getting on or off the exam table, as well as no difficulty arising from a chair. *Id.* He noted Plaintiff

---

contracts between Dr. Feinerman and the Illinois Department of Human Services, Complaints filed with the Illinois Department of Human Services regarding Dr. Feinerman, Payments made to Dr. Feinerman by the Illinois Department of Human Services, and Claimant evaluations of Dr. Feinerman conducted pursuant to ILL. ADMIN. CODE. Tit. 8, § 840.11. *Id.*

had mild difficulty tandem walking, squatting, and arising.[3] *Id.* Lastly, he noted that Plaintiff was unable to stand on his toes or heels. *Id.*

On May 12, 2021, X-rays of Plaintiff's right ankle, left knee, and lumbar spine were performed in collaboration with his physical exam. (Doc. 11, Exh. 7, p. 136). The findings and impressions recorded by Dr. Neetin Patel ("Patel") on Plaintiff's ankle were as follows: "no acute fracture, dislocation, destructive process, resection of distal right fibula. Extensive surgical hardware is noted in the region of right ankle. Complete fusion of right ankle joint. Severe DJD subtalar joint. No osseous erosive changes." *Id.* Patel also reviewed Plaintiff's knee x-ray, noting that there was "no acute fracture, dislocation, destructive process. Mild osteoarthrosis left knee joint. Soft tissue swelling. Joint effusion. No osseous erosive changes. Radiolucent lesion posterior aspect of tibial plateau. It measures 2 x 1.5 cm in size. Sclerotic border. Findings compatible with benign nonossifying fibroma." *Id.* at p. 140.

## C.   *Plaintiff's Function Report*

Plaintiff submitted a function report to the Social Security Administration on January 17, 2021. (Doc. 11, Exh. 6, p. 14). In the form, Plaintiff reported information about his illnesses, injuries, and conditions, as well as his daily activities. Plaintiff stated the following in response to the question "[h]ow do your illnesses, injuries or conditions limit your ability to work?":

> Because of the fusion of right ankle climbing ladders and getting on roofs is to[o] hard on knee and legs. Walking for periods of time on level and

---

[3]     The range of motion chart is included at the end of Feinerman's report. (Doc. 11, Exh. 7, p. 133-134).

> unlevel ground anymore is hard on ankles, knees, hips and back. The same goes for when we do concrete work. Balance is becoming a problem with combination of neck problems and ankle. Can't lift things like I use[d] to.
>
> Different things are causing lots of pain, swelling, soreness, taking more days to recover.

(Doc. 11, Exh. 6, p. 14). Plaintiff then described his daily routine as follows: "[f]irst 30 min. of day it takes to get legs moving, take care of animals, eat b-fast, get on heating pad, noontime check on animals, eat lunch, watch tv and sit on heating pad. Supper, and take care of animals again, watch tv then bed." *Id.* at p. 15. He also reported that he is now unable to lift or carry bags of feed and bales of hay and that he has difficulty sleeping because "pain wakes [him] up." *Id.*

Plaintiff proceeded to describe how his illnesses, injuries, and conditions impact his ability to engage in personal care. (Doc. 11, Exh. 6, p. 15). Plaintiff has difficulty putting on his jeans and taking his boots on and off. *Id.* Plaintiff can prepare his own meals, including soup, sandwiches, frozen waffles, eggs, and leftovers. *Id.* at p. 16. Plaintiff can take care of his animals, wash dishes, and do laundry. *Id.* at p. 16. He spends approximately thirty minutes twice per day taking care of the animals and completes dishes and laundry as needed. *Id.* Plaintiff goes outside daily and can drive and ride in a car. *Id.* at p. 17. He can also shop for "basics" in a store every two weeks, and the shopping takes him approximately one and a half hours to complete. *Id.*

Plaintiff also recounted his hobbies, interests, and social activities. (Doc. 11, Exh. 6, p. 18). Plaintiff enjoys hunting, woodworking, horses, and tv. *Id.* He hunts one to two times per year, woodworks every "now and then," and watches tv daily. *Id.* However,

Plaintiff can no longer use a tree stand while hunting or stand or sit in one spot for long periods of time. *Id.*

In the section of the form that requested Plaintiff provide information about how his illness, injuries, or conditions impact his abilities, Plaintiff marked that his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks were negatively impacted. (Doc. 11, Exh. 6, p. 19). He further specified that he is limited to lifting 30 pounds, walking one eighth of a mile, sitting for one to two hours and indicated that completing tasks takes a lot longer due to pain. *Id.*

DISCUSSION

## I.   The ALJ Did Not Play Doctor.

Plaintiff first alleges that the ALJ played doctor when she concluded that "there [was] no record of treatment or observation to corroborate the severity of [Plaintiff's] right ankle pain and limitation the claimant describe[d] at his hearing." (Doc. 17, p. 6). The ALJ based her finding on the 2021 consultative examination conducted by Dr. Feinerman and recounted the results of the collaborative x-ray imaging taken on May 12, 2021. *Id.* Specifically, the ALJ noted that the x-ray of Plaintiff's right ankle showed "severe degenerative changes of the subtalar bone." *Id.* However, Plaintiff disputes the ALJ's review – stating that the x-ray report showed severe degenerative changes of the "subtalar joint." *Id.* Plaintiff therefore asserts that the ALJ independently interpreted the x-ray evidence when determining Plaintiff's RFC. In contrast, the Commissioner argues that the ALJ did not interpret the x-ray evidence, but rather relied on Feinerman's evaluation of the x-ray in making her determination. The Court agrees with the

Commissioner's analysis.

The sole power of determining Plaintiff's RFC lies with the ALJ. *See Stephen R.S. v. Commissioner of Social Security*, Case No. 3:20-cv-01160-GCS, 2022 WL 16578293, at *5 (S.D. Ill. Aug. 17, 2022). However, an ALJ may not craft the RFC without an evidentiary basis. *See Newell v. Astrue*, 869 F. Supp.2d 875, 890-891 (N.D. Ill. 2012). When analyzing whether an evidentiary basis for the RFC exists, courts analyze whether there is a logical bridge between the evidence in the record and the ALJ's determination. *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). While an ALJ is required to recite the data that the ALJ consulted to ascertain the RFC, *see Lea A.T. v. Commissioner of Social Security*, Case No. 20-cv-180-RJD, 2020 WL 5038604, at *9 (S.D. Ill. Aug. 26, 2020), the ALJ may not interpret the data when crafting the RFC. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). Thus, when an ALJ makes an independent medical finding regarding whether particular activities are inconsistent with a medical diagnosis, the ALJ is impermissibly "playing doctor." *See, e.g., Rohan v. Chater*, 98 F.3d 966, 970-971 (7th Cir. 1996) (finding error where the ALJ independently determined the plaintiff's efforts at engaging in a small machine repair and resale business contradicted a diagnosis of major depressive disorder). This is because the ALJ is stepping beyond their expertise as an adjudicator, and in such cases, reversal is required. *See Mandrell v. Kijakazi*, 25 F.4th 514, 518 (7th Cir. 2022).

Here, while it is true that the ALJ misstated the precise language describing the x-ray findings from Feinerman's report, she did not independently assess the x-ray findings. The ALJ incorrectly stated that the x-ray showed "severe degenerative changes

of the subtalar bone" as opposed to "severe DJD of the subtalar joint." However, the ALJ included along with the recitation of the x-ray findings, Dr. Feinerman's analysis of the condition of Plaintiff's ankle. The ALJ noted that Feinerman found "no functional limitations except in the ability to stand on his toes and tandem walk due to the fused right ankle joint." Feinerman's conclusion contributed to the ALJ's determination of Plaintiff's RFC, not her own interpretation of Plaintiff's x-ray. Thus, she did not impermissibly "play doctor" as Plaintiff alleges.

## II.    The Administrative Law Judge Did Not Fail to Consider Plaintiff's Reasons for Lack of Treatment.

Plaintiff also claims that the ALJ failed to consider his subjective reports explaining why he failed to seek additional treatment for his ankle or shoulder. Plaintiff noted that he failed to seek additional treatment because he lacked insurance and could not afford to pay out-of-pocket. (Doc. 17, p. 7). The Commissioner contends that the ALJ did consider Plaintiff's explanation, directing the Court to two places in the ALJ's decision where she weighed Plaintiff's testimony on the issue. (Doc. 23, p. 9). The Court finds that the ALJ's consideration of Plaintiff's explanation for lack of treatment is consistent with the social security regulations and is not grounds for remand.

Social Security Regulation ("SSR") 16-3p provides guidance in the application of 20 C.F.R. § 404.1529, which states that the Administration "will carefully consider" information it has about the claimant's symptoms, including information about medications and treatments. According to SSR 16-3p, the Administration may not use the failure to pursue treatment as a reason for discounting an individual's claims regarding

symptom intensity, persistence, and limiting effects, "without considering possible reasons he or she may not . . . [s]eek treatment consistent with the degree of his or her complaints." SSR 16-3p at *8. Further, the regulation states that the Social Security Agency will consider and address reasons for not pursing treatment pertinent to each individual's case. *Id.* While evaluating symptom severity, the ALJ must "explain how [he] considered the individual's reasons for not seeking treatment," doing so in a manner sufficient to allow the Court to trace that path of his reasoning. *Id.* Thus, while it is true that an ALJ must first consider a claimant's explanation for not seeking treatment before making an adverse credibility finding, failure to obtain treatment can support an adverse credibility finding where the claimant does not have good reason for not seeking additional treatment. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

As noted, the Commissioner points out that the ALJ considered Plaintiff's explanations for lack of treatment twice in her decision. On page five of the ALJ's decision, the ALJ recognized that "the claimant testified his only treatment [for his shoulder] was chiropractic, and that he stopped that due to money and because the chiropractor could not do any more for him." (Doc. 11, Exh. 2, p. 20). Again, on page six of the ALJ's decision, the ALJ recounted that Plaintiff testified that he discontinued treatment for his right ankle because "of lack of insurance, but he also [said] he . . . never tried to qualify for a state medical card." *Id.* at p. 21. The ALJ recognized that Plaintiff had alterative means through which he could have accessed treatment, yet he failed to pursue them. In conjunction with this fact and Plaintiff's daily activities but limited records of treatment, the ALJ concluded that Plaintiff could perform light work. Specifically, the

ALJ:

> considered all the claimant's impairments, including degenerative joint disease of the right ankle and right shoulder, mild osteoarthrosis of the left knee, and degenerative disc disease of the cervical spine. After review of the entire record, the undersigned finds the claimant is able to perform light work, with additional limitations. The ability to perform light work is supported by the lack of significant treatment, conservative care with some chiropractic treatment and use of over the counter medication, and the claimant's wide range of daily activity including self-care, food preparation, dishes and laundry, hunting and woodworking, and care for animals.

(Doc. 11, Exh. 2, p. 22). Thus, the Court believes the ALJ considered Plaintiff's explanation against competing evidence in the record to reach her conclusion.[4] As such, the Court finds that the ALJ's analysis is consistent with SSR-16-3p.

## III.   The Administrative Law Judge Did Not Misstate Plaintiff's Activities of Daily Living or Ignore any Qualifying Descriptions.

Plaintiff next alleges that the ALJ "incorrectly state[d] that [his] 'wide range of daily activities supports an ability to perform light work.'" (Doc. 17, p. 8). Plaintiff points out discrepancies between his testimony provided to the ALJ at the May 2022 hearing and the Function Report that was submitted to the Social Security Administration on January 17, 2021.[5] *Id.* at p. 8-10. The Commissioner contests Plaintiff's characterization of

---

[4]      Moreover, the ALJ was not required to query Plaintiff further about why he did not seek additional treatment as it was his burden to supply evidence in support of his claim of disability. *See, e.g., Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) (stating that "Social Security Rule 16-3p did not require the ALJ to ask [the claimant] about her failure to seek treatment.").

[5]      Specifically, Plaintiff disputes the ALJ's characterization of his abilities as he noted in his function report that he is unable to climb a tree stand, walk far on muddy ground, and sit or stand for long periods of time in one spot. (Doc. 17, p. 9). Plaintiff believes that such limitations are inconsistent with an individual being able to perform light work. *Id.* Moreover, Plaintiff argues that his ability to engage in "self-care" and perform limited household chores does not correlate with his ability to perform light work on a full-time sustained basis. *Id.* at p. 8.

the record arguing that the ALJ considered both the function report and the hearing testimony and asserting that the ALJ was not required to limit her consideration to Plaintiff's hearing testimony alone. (Doc. 23, p. 9-10). Once again, the Court agrees with the Commissioner's assessment.

A plaintiff's subjective statements as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by objective evidence. *See* 42 U.S.C. § 423(d)(5)(A). The regulations instruct ALJs to consider a number of factors when making the disability determination, including (1) relevant medical evidence detailing intensity and limiting effects of symptoms, 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); treatment and efficacy, *Id.* at § 404.1529(c)(3) (iv)-(v), 416.929(c)(3)(iv)-(v); (3) return to gainful activity, *Id.* at §§ 404.1571, 416.471; (4) work during the disability period, *Id.*; (5) daily activities, *Id.* at §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); and (6) statements inconsistent with the record, *Id.* at §§ 404.1529(c)(4). 416.929(c)(4). An ALJ need not discuss every detail in the record as it relates to each factor but may not ignore an entire line of evidence contrary to their ruling. *See Gedatus v. Saul,* 994 F.3d 893, 902-903 (7th Cir. 2021); *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020). Regarding Plaintiff's daily activities, an ALJ may not equate activities of daily living with those of a full-time job. *See Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). However, like the remaining factors, it is the ALJ's responsibility to decide the facts and resolve discrepancies in those accounts. *See Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000).

Here, the ALJ considered both Plaintiff's testimony at the May 2022 hearing as well as the January 2021 Function Report. This analysis is located on page twenty-one of the

ALJ's decision, where she reflects on both pieces of competing evidence as follows:

> Despite his ailments, the claimant has a fair amount of daily activity. He lives with his girlfriend in a house, and there are two steps to get up into the house. (Hearing Testimony.) The claimant uses rails to get up the steps. He does a few chores in the morning, feeds his son's four horses, feeds the horses two cups of grain each, and walks about 20 feet to the feeder. (Hearing Testimony.) The claimant's son does not live with him. The claimant says his girlfriend does the chores and he spends his day lying on a heating pad, applying ice, and elevating his right leg to waist level or higher. The claimant says he cannot drive his truck regularly because he has to use his left foot to drive rather than the right, but he drives if he has to. His function report reflects he cares for the animals in the morning, at noontime, and around suppertime. (Exhibit 3E/2.) He bathes and performs self-care, prepares meals like sandwiches and eggs, does dishes and laundry, drives, shops in stores every two weeks for an hour and a half, and his hobbies including hunting, woodworking, and horses. He hunts once or twice per year and he does woodworking every now and then. (Exhibit 3E.)

(Doc. 11, Exh. 2, p. 22). The ALJ then went on to conclude, having considered "all the claimant's impairments . . . [and] the entire record" that Plaintiff could perform light work with additional limitations. *Id.* The ALJ opined that Plaintiff's conservative treatment with some chiropractic care and use of over-the-counter medications, as well as his range of daily activities justified her conclusion. *Id.* Moreover, the ALJ made additional accommodations for Plaintiff, noting that he cannot climb ladders, ropes or scaffolds, only occasionally climb ramps, stairs, stoop, kneel, crouch and crawl, and occasionally reach over head with the dominant right upper extremity. *Id.* Accordingly, the Court finds that the ALJ's analysis was supported by substantial evidence in the record and is not patently wrong.

**IV.    The Administrative Law Judge's ultimate residual functional capacity ("RFC") was not tainted by a patently erroneous consultative examination report.**

Plaintiff contests the findings of consultative examiner, Dr. Adrian Feinerman as

"patently erroneous" for two reasons. (Doc. 17, p. 10-11). First, Plaintiff asserts that Dr. Feinerman's physical exam finding "no signs of joint effusion" contradicts the x-ray evidence submitted indicating that Plaintiff has joint effusion in his left knee; this renders Feinerman's report invalid.[6] *Id.* at p. 11. Second, Plaintiff argues that Feinerman's history of complaints from the Illinois Department of Human Services, which allege that Feinerman's consultative exams are inadequate, should call into question the ALJ's reliance on his report. *Id.* The Court finds neither of Plaintiff's arguments persuasive.

First, the Court will address Plaintiff's argument concerning the history of complaints against Dr. Feinerman. Plaintiff submitted evidence obtained from a FOIA request to support his proposition that Feinerman's consultative exams are inadequate. (Doc. 17, Exh. 1). However, the Court cannot consider extra-record documents. *See, e.g., Mathews v. Weber*, 423 U.S. 261, 270 (1976) (stating that "under [§] 205(g) of the Social Security Act, 42 U.S.C. [§] 405(g), neither party may put additional evidence before the district court."). The only exception that exists within the statutory framework is a sentence six remand, which permits a court to remand to the Commissioner to consider evidence that is new and material, and where good cause exists for failing to incorporate that evidence into the record during the administrative proceedings. *See, e.g., Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993) (stating that "[t]o prevail on this issue, then, the plaintiff must meet the requirements of newness, materiality and good cause.").

---

[6] Plaintiff also argued that Feinerman misstated which of Plaintiff's ankles were fused. However, upon review of the record, Feinerman clearly states that upon exam Plaintiff's "right ankle is fused." (Doc. 11, Exh. 7, p. 131). Thus, the Court will not address this argument further.

Beyond a sentence six remand, the Court may only consider extra record evidence when the evidence suggests decision maker bias. *See Department of Commerce v. New York*, 139 S. Ct. 2551, 2573-2574 (2019). Plaintiff does not argue that the ALJ acted with bias. Moreover, Plaintiff does not directly request a sentence six remand, nor does he address the factors of newness, materiality, or good cause. However, even if material to Plaintiff's argument, Plaintiff's evidence is not new and good cause does not exist to explain Plaintiff's failure to incorporate the evidence into the existing record. According to the exhibit, which contains correspondence between Plaintiff's attorney and the Illinois Department of Human Services regarding Feinerman's complaint history, Plaintiff's attorney received the response to his FOIA request around April 1, 2021. (Doc. 17, Exh. 1, p. 2). Plaintiff's hearing before the ALJ took place in May 2022. Had Plaintiff wanted to advance this argument, he had an opportunity to do so before the ALJ as he acquired the documentary evidence well before his hearing date. However, Plaintiff chose not to pursue the argument before the ALJ, and the Court will not consider the argument now.

As to Plaintiff's argument concerning the discrepancy between Feinerman's physical consultative exam assessment and the x-ray performed of Plaintiff's knee on May 12, 2021, the Court does not believe the discrepancy invalidates Feinerman's consultative exam report. Rather, Feinerman's physical exam of Plaintiff and the x-ray of Plaintiff's knee represent two pieces of competing medical evidence to be weighed by the ALJ. This is precisely what the ALJ did. Plaintiff notes that Feinerman's report stated that "there was no evidence of redness, warmth thickening, or effusion of any joint." (Doc. 11, Exh. 7, p. 131). However, it appears as though this finding was reached only through

completion of Plaintiff's physical exam. *Id.* Although, Feinerman did not refer to Dr. Natin Patel's diagnostic impression of Plaintiff's left knee x-ray in his report, the ALJ referred to Patel's finding in her decision, noting that Plaintiff's x-rays showed "mild osteoarthrosis of the left knee with benign fibroma." (Doc. 11, Exh. 2, p. 23). Joint effusion is a symptom of mild osteoarthrosis.[7] Thus, Plaintiff's left knee condition and associated symptomology were appropriately considered by the ALJ in making her RFC determination, as the ALJ considered both pieces of medical evidence available to her. *See, e.g., Carroll v. Barnhart*, 291 F. Supp. 2d 783, 795-796 (N.D. Ill. 2003) (finding that the ALJ's decision was supported by sufficient evidence when the ALJ consulted available x-rays and treatment notes).

## CONCLUSION

For the foregoing reasons, the Court **DENIES** the Claimant's Motion for Remand and **AFFIRMS** the Commissioner's decision.

> **IT IS SO ORDERED.**

> **DATED:  September 18, 2024.**

Digitally signed by Judge Sison
Date: 2024.09.18
13:03:42 -05'00'

_____

**GILBERT C. SISON**
**United States Magistrate Judge**

---

[7]      *See, e.g.*, Nasimah Maricar et al., *Clinical Assessment of Effusion in knee osteoarthritis – a Systematic Review*, 45 SEMIN. IN ARTHRITIS AND RHEUMATISM 556, 556 (2016) (noting that knee effusion is common among people with knee osteoarthritis).